UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


ANNIE TONEY                                              PLAINTIFF

VS.                              CIVIL ACTION NO. 3:14CV456TSL-JCG

SELECT SPECIALTY HOSPITAL D/B/A
SELECT EMPLOYMENT SERVICES, INC.; AND
SELECT SPECIALTY HOSPITAL-JACKSON, INC.                 DEFENDANTS


MEMORANDUM OPINION AND ORDER

     This cause is before the court on the motion of defendants

Select Specialty Hospital d/b/a Select Employment Services, Inc.

and Select Specialty Hospital-Jackson, Inc. (Select Hospital) for

summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure.  Plaintiff Annie Toney has responded in opposition to

the motion.  The court, having considered the memoranda of

authorities, together with attachments, submitted by the parties,

concludes that defendant's motion is well taken and should be

granted.

     Background

     Select Hospital is a fifty-three bed long-term acute care

hospital that provides diagnostic and medical treatment to

patients with chronic diseases or complex medical conditions.

Plaintiff Toney, who is African-American, was employed by Select

Hospital as a registered nurse from 2004 until her termination in

January 2013.  Her primary duties with Select Hospital were to

provide patient care in one of the Hospital's four units:  ICU, East, Central and West.  Depending on staffing, she would have one to three patients in the ICU or four to six patients in the other three units.

On the afternoon of January 16, 2013, Toney left the hospital in the middle of her shift to attend to some personal business. A week later, she was terminated, ostensibly because Select Hospital, upon investigation, determined that on that occasion, Toney, upon leaving the hospital mid-shift, had assured the charge nurse she would return before her patients needed care, yet she failed to return until long after her shift had ended, abandoning her patients and leaving the remaining nursing staff scrambling to ensure her patients received care from the time she left until her shift ended at 7:30 p.m.  Toney denies she abandoned her patients; she claims she had permission to leave and had made proper arrangements for her patients' care in her absence.  She claims the real reason she was terminated was her race.

Following her termination, Toney filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), claiming she was terminated on account of her race.  After receiving her EEOC right-to-sue letter, Toney filed this lawsuit asserting claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. and 42 U.S.C. § 1981, based on alleged race discrimination in the terms and conditions of her employment,

culminating in her termination from employment.  More particularly, Toney alleges that during her employment, she was passed over for promotion on account of her race; that in general, white nurses received preferential treatment by Select Hospital; that she was subjected to a racially hostile work environment; and that ultimately, she was terminated because of her race.  In addition to these federal claims, Toney has asserted state law claims for breach of contract and intentional infliction of emotional distress.[1]  Select Hospital seeks summary judgment on all of these claims.

    Summary Judgment Standard

    Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  In evaluating a summary judgment motion, the court must construe "all facts and inferences in the light most favorable to the nonmoving party."  McFaul v. Valenzuela, 684 F.3d 564, 571 (5th Cir. 2012)

_____

        [1]    Toney's complaint was originally filed in the Circuit Court of Hinds County, Mississippi, but was timely removed by Select Hospital on the basis of federal question jurisdiction under 28 U.S.C. § 1331.

(quoting <u>Dillon v. Rogers</u>, 596 F.3d 260, 266 (5th Cir. 2010)). However, "[s]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." <u>Id.</u>

    <u>Race Discrimination: Title VII/Section 1981</u>

    Toney has brought her claims for race discrimination under Title VII and § 1981, both of which prohibit employers from taking adverse employment actions against employees on the basis of race. <u>See</u> 42 U.S.C. § 2000e-2(a)(1) (making it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... race"); 42 U.S.C. § 1981(a) (prohibiting racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"). In general, in the employment context, the same standards that apply to race discrimination claims under Title VII apply to such claims under § 1981. <u>See</u> <u>DeCorte v. Jordan</u>, 497 F.3d 433, 437 (5th Cir. 2007) ("Claims of racial discrimination in employment, pursuant to 42 U.S.C. § 1981, are governed by the same analysis as that employed for such claims under Title VII.").

<u>Discriminatory Discharge</u>

Since Toney has no direct evidence of discrimination, the court applies the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), to evaluate her claims. See <u>Mayberry v. Vought Aircraft Co.</u>, 55 F.3d 1086, 1089-91 (5th Cir. 1995). Under that framework, to prove her claim of discriminatory discharge, Toney must first establish a *prima facie* case of discrimination. <u>Wheeler v. BL Dev. Corp.</u>, 415 F.3d 399, 405 (5th Cir. 2005) (citation omitted). If she can establish a *prima facie* case, defendant must then offer a legitimate, non-discriminatory reason for her termination, at which time plaintiff "'must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative).'" <u>Keelan v. Majesco Software, Inc.</u>, 407 F.3d 332, 341 (5th Cir. 2005) (quoting <u>Rachid v. Jack In The Box, Inc.</u>, 376 F.3d 305, 312 (5th Cir. 2004)).

Typically, to prove a *prima facie* case of discriminatory discharge, the plaintiff must establish that she (1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by

5

someone outside the protected class, or, in the case of disparate treatment, show that other similarly situated employees were treated more favorably.  Bryan v. McKinsey & Co., Inc., 375 F.3d 358, 360 (5th Cir. 2004) (citing Okoye v. Univ. of Texas Houston Health Sci. Ctr., 245 F.3d 507, 512 (5th Cir. 2001)).  The Fifth Circuit has held that, alternatively, "[i]n work-rule violation cases, a Title VII plaintiff may establish a *prima facie* case by showing 'either that he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished similarly.'"  Mayberry, 55 F.3d at 1090 (quoting Green v. Armstrong Rubber Co., 612 F.2d 967, 968 (5th Cir. 1980)).

Select Hospital does not dispute that plaintiff can establish the first three elements of the usual *prima facie* case:  Toney is a member of a protected class, was qualified for her position and was subject to an adverse employment action.  However, Select Hospital challenges the sufficiency of Toney's proof as to the fourth element, i.e., the requirement that she present evidence to create a triable issue with respect to whether she was replaced by someone outside the protected class, or whether other similarly situated employees were treated more favorably.  Bryan, 375 F.3d at 360.  For her part, Toney does not contend she was replaced by someone outside the protected class.[2]  Rather, her position is

---

[2]     She was not.  Defendant has presented uncontroverted evidence that she was replaced by an African-American.

that she did not violate a work rule or that, even if she did,
white employees who committed similar infractions were treated
more favorably.

Collateral Estoppel Defense:  Select Hospital argues that, at
least as to her claim under § 1981, plaintiff is collaterally
estopped from denying that she was terminated for engaging in
misconduct based on findings made by the Mississippi Department of
Employment Security (MDES) on her post-termination claim for
unemployment benefits.  It notes that after she was terminated,
Toney filed an application for unemployment benefits with the
MDES.  The MDES claims examiner found she was disqualified from
benefits on the ground that she was discharged for cause.  Toney
appealed, and following a hearing, the administrative law judge
(ALJ) likewise found she was discharged for misconduct.  He
specifically found the following: that Toney told the charge nurse
around 2:15 p.m. on January 16, 2013 that she had to leave to take
care of some personal business and would be back before it was
time to do anything else for her patients; that she did not return
in time to do the next scheduled things for her patients; that
Select Hospital attempted to call her but only got her voice mail;
that when she eventually called back around 5:30 p.m., she advised
she was in court as a witness for a friend and did not know when
she would be finished; and that she did not return to the hospital

until after her shift had ended, at which time she was sent home.
The ALJ found:

> The claimant was absent from work for over five hours
> and the employer did not know where she was prior to her
> call after 5:00 p.m.  It is the opinion of the
> administrative law judge that the Claimant's discharge
> was for actions which substantially disregarded the
> standard of behavior that an employer has the right to
> expect from an employee and justifies disqualification
> for benefits under the above section of the Law.

Defendant submits that the determination by the MDES that Toney

engaged in work-related misconduct, for which she was terminated,

operates under the doctrine of collateral estoppel to preclude her

from relitigating that issue in this court.  In other words, it

contends she is precluded from asserting or undertaking to prove

in this cause that she did not violate the work-rule for which

Select Hospital contends she was terminated.

The rules governing collateral estoppel, or issue preclusion,

differ for Title VII and § 1981 claims; Toney has asserted both.

As this court explained in <u>Johnson v. Mississippi Power Co.</u>,

> [I]n a Title VII action, a prior state decision enjoys
> preclusive effect only if rendered or reviewed by a
> court; "[a]n administrative decision involving Title VII
> claims that is not reviewed by a state or federal court
> may not preclude a subsequent Title VII claim."  <u>Thomas
> v. Louisiana, Dept. of Social Services</u>, 406 Fed. App'x
> 890, 894-95 (5th Cir. 2010) (citing <u>Elliott</u>, 478 U.S. at
> 796)).  <u>See also</u> <u>Roth v. Koppers Indus., Inc.</u>, 993 F.2d
> 1058, 1062 (3d Cir. 1993) ("Following <u>Elliott</u>, the
> courts of appeals have unanimously concluded that
> unreviewed administrative agency findings can never be
> accorded issue preclusive effect in subsequent Title VII
> proceedings."); <u>McInnes v. California</u>, 943 F.2d 1088,
> 1093-94 (9th Cir. 1991) ("The clear teaching of <u>Elliott</u>

> is that in a Title VII action a prior state decision enjoys preclusive effect only if rendered or reviewed by a court.... In contrast, unreviewed administrative determinations lack preclusive effect in a subsequent Title VII action, regardless of any preclusive effect state law might accord to them.").
> ...
> While unreviewed state administrative fact-finding is never entitled to preclusive effect in actions under Title VII, that is not so as to claims brought under § 1981.  See Elliott, 474 U.S. at 796-97 (applying collateral estoppel to state administrative fact-findings for purposes of sections 1981 and 1983 but not for purposes of Title VII, and explaining that "Congress in enacting the Reconstruction civil rights statutes, did not intend to create an exception to general rules of preclusion").

Johnson v. Mississippi Power Co., No. 3:13CV798TSL-JMR, 2014 WL 1153711, at *3 (S.D. Miss. Mar. 21, 2014).  In this case, it is unclear from the record whether Toney appealed the decision of the MDES to any court.  Toney did state in her deposition that she appealed the decision of the ALJ to the "Fifth Circuit Court." However, there is no "Fifth Circuit Court" in Mississippi. Moreover, the decision of the ALJ would not have been appealed directly to a court; the next level of review would have been to the Board of Review.  See Miss. Code. Ann. § 71-5-519 - 529.  An adverse decision of the Board of Review could have been appealed to the Circuit Court of the County in which Toney resides (i.e., the Circuit Court of Hinds County, in the First Judicial District).  Miss. Code Ann. § 71-5-531.  Yet Toney, who was not represented by counsel in the MDES proceeding, did not indicate that there was an appeal to or from the Board of Review.  Lastly,

no documentary evidence has been presented evidencing an appeal to
any court.  All that is before the court is the testimony of
Toney, which is not consistent with the prescribed appeal
procedures.  Under the circumstances, for purposes of Toney's
Title VII claim, the court is not persuaded that it would be
proper to accord preclusive effect to findings of the MDES.  <u>See</u>
<u>Thomas</u>, 406 Fed. App'x at 895 (declining to give ruling of state
unemployment compensation agency that the plaintiff's termination
was justified preclusive effect where it was not clear from the
record whether she had appealed that ruling to state court).

On the other hand, for purposes of her § 1981 claim,
collateral estoppel does preclude Toney from relitigating the
MDES's finding that she engaged in misconduct, for which she was
terminated.  <u>See</u> <u>Elliott</u>, 474 U.S. at 796-97 (applying collateral
estoppel for purposes of claims under §§ 1981 and 1983 but not for
purposes of Title VII claim); <u>Jett v. Dallas Indep. School Dist.</u>,
798 F.2d 748, 763 n. 14 (5th Cir. 1986) (noting that in some
respects relief is available under Title VII where it is not under
§§ 1981 and 1983, and citing <u>Elliott</u> for recognition of difference
in application of collateral estoppel to the latter but not the
former); <u>Johnson</u>, 2014 WL 1153711, at *3 (concluding that
collateral estoppel did not apply to Title VII claim, but holding
as to § 1981 claim that "since Mississippi courts give preclusive
effect to the decisions of the MDES, if supported by the evidence

and in the absence of fraud, then so should this court") (citing
Cox, 564 F.3d at 748).  However, it is clear from the undisputed
record evidence that Toney cannot avoid summary judgment,
irrespective of whether collateral estoppel precludes her from
relitigating whether she engaged in misconduct, for which she was
terminated.  That is, summary judgment is proper as to both her
Title VII and § 1981 claims; the only difference comes in the
specific reason *why* summary judgment is proper.

Section 1981

Based on the findings of the MDES, it is taken as established
for purposes of Toney's § 1981 claim that she engaged in
misconduct that resulted in her termination.  Accordingly, she can
establish a *prima facie* case of discriminatory discharge only by
showing that employees outside her protected class were treated
more favorably under circumstances "nearly identical" to hers.
See Mayberry, 55 F.3d at 1090.  This, she cannot do.

The Fifth Circuit has explained what it means by "nearly
identical" as follows:

> Employees with different supervisors, who work for
> different divisions of a company or who were the subject
> of adverse employment actions too remote in time from
> that taken against the plaintiff generally will not be
> deemed similarly situated.  Likewise, employees who have
> different work responsibilities or who are subjected to
> adverse employment action for dissimilar violations are
> not similarly situated.  This is because we require that
> an employee who proffers a fellow employee as a
> comparator demonstrate that the employment actions at
> issue were taken "under nearly identical circumstances."

11

The employment actions being compared will be deemed to
have been taken under nearly identical circumstances
when the employees being compared held the same job or
responsibilities, shared the same supervisor or had
their employment status determined by the same person,
and have essentially comparable violation histories.
And, critically, the plaintiff's conduct that drew the
adverse employment decision must have been "nearly
identical" to that of the proffered comparator who
allegedly drew dissimilar employment decisions.  If the
"difference between the plaintiff's conduct and that of
those alleged to be similarly situated accounts for the
difference in treatment received from the employer," the
employees are not similarly situated for the purposes of
an employment discrimination analysis.

We do not, however, interpret "nearly identical" as
synonymous with "identical."  Applied to the broader
circumstances of a plaintiff's employment and that of
his proffered comparator, a requirement of complete or
total identity rather than near identity would be
essentially insurmountable, as it would only be in the
rarest of circumstances that the situations of two
employees would be totally identical.  For example, it
is sufficient that the ultimate decisionmaker as to
employees' continued employment is the same individual,
even if the employees do not share an immediate
supervisor.  Each employee's track record at the company
need not comprise the identical number of identical
infractions, albeit these records must be comparable.
As the Supreme Court has instructed, the similitude of
employee violations may turn on the "comparable
seriousness" of the offenses for which discipline was
meted out and not necessarily on how a company codes an
infraction under its rules and regulations.  Otherwise,
an employer could avoid liability for discriminatory
practices simply by coding one employee's violation
differently from another's.

Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 259-61 (5th Cir.

2009).

     Toney argues that even if she violated Select Hospital's

policy regarding unauthorized absence from her work station, she

12

was terminated for that single infraction while white nurses who repeatedly engaged in similar or "even worse" misconduct were not. In interrogatory responses, Toney broadly claimed that "similarly situated white nurses ... were missing from the work area and altogether absent on certain days, (and/or absent or extended periods of time) yet they were not significantly reprimanded, nor were they terminated under similar circumstances as me." Similarly, in her deposition, Toney testified generally that white nurses were frequently missing from the floor without permission for unknown periods of time and for unknown reasons without having been disciplined, much less terminated.  She repeatedly acknowledged, however, that she did not know why or how long these other individuals were gone from the work area:

> I can't tell you how long they were gone.  I can tell
> you that they left the work area for periods of time and
> no one knew where they were.  Obviously they didn't have
> permission to leave. ...
> ...
> I can't tell you the period of time the nurses would
> have been gone.  ... I can't tell you that they were
> gone for five hours, but what I can tell you is if
> they're gone for ten minutes without permission, it's –
> it's more than – well, it's worse than what I did.  I
> had permission to leave.  They were leaving without
> permission.  No one knew where they were.

She further stated:

> It is correct that other white nurses have left the work
> area unexplained without permission for whatever period
> of time that they were gone and they were not
> terminated.
> ...

13

[O]ther white nurses left the work area.  It was not
explained as to where they went, why they went, and they
were not given permission. ... Whether they were gone
for five hours or whether they were gone for one hour,
white nurses were allowed to be out of the work area
without permission and were not terminated.

When asked about specific individuals who had engaged in such alleged misconduct, Toney identified eight putative comparators: Robert "Joseph" Simmons, Amanda Letchworth, Al Spilley, Cindy Patterson, Patsy McMillan, Brian Buckley, Shannon Devine and Sarah Myers.  Her evidence, however, is plainly insufficient to create a genuine issue of material fact as to whether any of these individuals could be found to be a proper comparator.[3]

As to Joseph Simmons, Toney claimed in interrogatory responses that he was "frequently absent under similar circumstances as I was absent" – a clearly conclusory assertion; yet when asked about Simmons in her deposition, she testified only that on several occasions, he was gone longer than thirty minutes for his lunch breaks.  Amanda Letchworth, she testified, "frequently left the unit and no one knew where she was for an extended period of time ... more than thirty minutes ...  Her patients are needing things and she's not answering the call.  I can't tell you how long that was."  However, she stated that she

---

[3]     In interrogatory responses, Toney additionally
identified as putative comparators Shelley Little, Pat Gardner,
Sheila Morris, Tamara Warnock, Amanda Bell, Angie Sandifer and
Leigh-Ane Hemphill.  However, she has offered no evidence of any
infraction committed by any of these individuals.

"was not privy to ... information" about the circumstances of why Letchworth was not in her work area.  In addition to her testimony, Toney has offered disciplinary records for Letchworth which reflect that from March through July 2011, Letchworth was issued several verbal and written warnings for tardiness, including one occasion when she was over thirty minutes late and another when she was late and failed to call in.[4]

Toney testified that Al Spilley would "just be gone.  And the same thing, patients needing things or nurses looking for him and he would not be on the unit."  Yet she could not say how long Spilley would be gone and agreed that "[t]o tell you how long is speculation."  Toney similarly testified that Cindy Patterson "would be gone"; she would "not be on the unit"; but as with the others, she did not know why, or for how long Patterson would be gone.

Toney stated in her deposition that Patsy McMillan was "[f]requently out of the work area" but could not say for what period of time or why McMillan was off the unit.  She did say that McMillan was a heavy smoker and would take smoke breaks; but according to Toney, she would be gone "longer than just smoking" and "[l]onger than it should have been."

---

[4]    Letchworth was terminated in November 2011 for violation of the Hospital's medication policies.

Regarding Brian Buckley, Toney stated that it was a "frequent occurrence that he was not on the unit."  In fact, she said, he was "almost never where he was supposed to be" except for when the supervisors were around; when they were around, he was "always there and bubbly ... making it very known that he was there."  Toney related that on one occasion, Shannon Devine was off the unit for more than an hour.  She did not know why Devine was off the unit; she knew only that Devine was being looked for.[5]

Finally, in interrogatory responses, Toney stated that Sarah Myers "is reasonably believed to have been drug impaired and missing from her work area.  She was frequently not at work until late and/or absent from work (or the work area), and/or she was frequently in an apparent impaired state...."  No specifics were provided, however; and, when asked in her deposition whether she was aware of the circumstances in which Myers was allegedly away from the unit, Toney responded, "I don't know why these people leave the unit and don't say—if they don't tell me, I don't have any way of knowing."  In her deposition, Toney did recall one instance in which Sarah Myers could not be found.  According to

---

[5]    Disciplinary records show that Devine's employment was terminated in March 2013 following an incident in which she left the building for a smoke break and took with her patient records that needed to be charted.  Devine apparently fell asleep in her vehicle and returned to the floor two hours later.  She was terminated for removing patient records from the building against Select Hospital policy.

Toney, "everybody was looking for Sarah, and she showed up coming out of a room incoherent, all but foaming at the mouth, not – just totally out of it."  Toney said she did not know how long Myers was missing, but that when she did reappear, it seemed to Toney that Myers was on drugs.  Toney admitted she did not know whether Myers was sent for a drug test or in any way disciplined for this incident.[6]

Viewing the evidence in the light most favorable to Toney, the proof shows, at most, that the putative comparators were sometimes tardy, often took long lunch breaks or smoke breaks or other breaks, or were otherwise absent from their work stations without permission for unspecified periods of time, though in a couple of cases, perhaps up to as long as an hour or two.[7]  It is manifest that none of this conduct is of comparable seriousness to Toney's actions – as found by the MDES – of leaving the hospital mid-shift and, after representing that she would be back before her patients needed attending, failing to return, without

---

[6]     Toney also did not state when this incident occurred. She does note that disciplinary records show that Myers was terminated on November 30, 2009 due to a positive drug test.

[7]     In fact, Toney has presented no competent evidence that any nurse was away from his or her work station without permission.  She has repeatedly asserted that these nurses were absent without permission but has also generally acknowledged that she was not aware of the specific circumstances of any of their absences.  The court, however, will assume for present purposes that the proffered comparators were at times away from their workstations without permission.

permission or explanation, for more than five hours, until after her shift had ended.  Therefore, Select Hospital is entitled to summary judgment on Toney's § 1981 claim as she has failed to proffer sufficient comparators and is thus unable to satisfy the fourth element of her *prima facie* case for discriminatory discharge.

Title VII

As stated, the court is unable at this time to conclude that the findings of the MDES are binding on Toney for purposes of her Title VII claim; and as to that claim, the court is of the opinion that she can establish her *prima facie* case, as she has presented sufficient evidence to create a genuine issue of fact as to whether she violated defendant's policies regarding unauthorized absence from one's workstation during the workday.  On this issue, Toney explained in her deposition testimony that shortly before midnight on January 15, 2013, she learned that she needed to be in court the following afternoon to testify on behalf of her son. She called in to the Hospital to see if she could be taken off the schedule for the following day and was told no.  Therefore, she reported for work, as scheduled, but right away told Joseph Simmons, the charge nurse who was her immediate supervisor, that she would need to leave that afternoon to take care of some important personal business.  Toney states she worked through her breaks and through lunch to make sure she got her patients fully

tended to, and around 2:30 p.m., let Simmons know she had done
rounds on her patients and was about to leave.  According to
Toney, she told Simmons she hoped to return before anything else
needed to be done on her patients; and Simmons agreed he would
care for her patients in her absence if they needed anything.
Toney explains that she had to turn her phone off while in court
and was not able to call in to the Hospital until 5:30 p.m.,
during a break.  When she did call in, she spoke with Josephine
Anderson, Chief Nursing Officer.  She explained to Anderson that
she was at court, giving testimony in a case - not her own – and
that court was not finished so she could not leave.  When court
ended, she returned to the hospital so that she could finish her
patients' charts.  When she got there, though, she was told to
leave.

   Select Hospital, through its Rule 30(b)(6) designee, Human
Resource Manager Vicki Watson, has agreed that if Toney, prior to
leaving, had finished the charting on her patients and had made
arrangements for another nurse to care for her patients for the
remainder of her shift and reported off on her patients, i.e.,
made sure the other nurse knew how to care for her patients, then
she would not have been in violation of Hospital policy and would
not have been terminated.  In the court's opinion, given this
concession by the Hospital and Toney's testimony that she did all
of these things, there is a disputed issue of fact as to whether

Toney has established her Title VII *prima facie* case of
discriminatory discharge.  However, Toney still cannot prevail on
this claim as she cannot rebut Select Hospital's proffered
legitimate nondiscriminatory reason for her termination.

In this regard, the Hospital has not explicitly denied
Toney's version of the events of January 16, 2013; that is, it has
not presented any evidence from Simmons to challenge what Toney
claims she told him or, in turn, what he told her.  It contends,
though, that in making the decision to terminate Toney's
employment, it relied in good faith on the information related by
Simmons and Anderson to management, which led it to conclude that
Toney had violated the Hospital's policies against unauthorized
absence.  Select Hospital has thus satisfied its burden to set
forth a legitimate nondiscriminatory reason for her termination.
Therefore, to avoid summary judgment, Toney is required to present
sufficient evidence from which a jury could reasonably infer that
the Hospital's reason is merely pretextual.

"A plaintiff may establish pretext either through evidence of
disparate treatment or by showing that the employer's proffered
explanation is false or 'unworthy of credence.'"  <u>Laxton v. Gap
Inc.</u>, 333 F.3d 572, 578 (5th Cir. 2003) (citing <u>Wallace v.
Methodist Hosp. Sys.</u>, 271 F.3d 212, 220 (5th Cir. 2001).  The
court has already concluded that Toney has failed to identify any
proper comparator and thus lacks proof of disparate treatment.

20

Accordingly, to establish pretext, she must show that the Hospital's proffered reason for her termination is untrue.

"An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." Id. However, to establish pretext, it is not sufficient merely to show that the Hospital was factually incorrect in its determination that Toney violated company policy. As the Fifth Circuit has made plain,

> pretext is not established merely because the company
> was mistaken in its belief, if honestly held. Whether
> [the employer's] conclusion was correct is irrelevant;
> if [the employer's] belief that [the plaintiff] violated
> company policy motivated its discharge decision, then it
> was not a pretext, and [the plaintiff] cannot meet [her]
> evidentiary burden. See Waggoner v. City of Garland,
> Tex., 987 F.2d 1160, 1166 (5th Cir. 1993) ("[The
> plaintiff] must, instead, produce evidence demonstrating
> that [the defendant] did not in good faith believe the
> allegations, but relied on them in a bad faith pretext
> to discriminate against him on the basis of his age.")

Swenson v. Schwan's Consumer Brands N. Am., Inc., 500 Fed. App'x 343, 346 (5th Cir. 2012). Here, while Toney has presented evidence which tends to show that her actions did not violate Hospital policy, she has no evidence to show that Select Hospital's belief that she violated policy, even if incorrect, was not honestly held. See id.

In an affidavit submitted in support of defendant's motion, Vicki Watson explained the circumstances which led Select Hospital to conclude that Toney had committed a terminable offense. Watson relates that on the afternoon of January 16, Joseph Simmons, the

charge nurse, reported to her the following: that around 2:30 p.m., Toney had told him she needed to run an errand and would be back before anything else was needed for her patients.  After an hour and fifteen minutes, he realized she had not returned to work.  At that point, he checked on her patients and discovered that her hourly rounds were not completed, documentation was not done, wound care was not completed, and none of the patient orders were processed.  Simmons notified George Hemphill, the former House Supervisor, of Toney's absence, and the two of them, in turn, notified Anderson, CNO, of Toney's absence.  Watson states that Simmons, Hemphill and Anderson reported to her that they attempted to contact Toney by phone, but she did not answer her cell phone and did not return any calls from them until 5:30 p.m., when she called into the Hospital.  Anderson, Watson states, reported that upon calling in, Toney told Anderson she was in court and had to turn off her cell phone; and when Anderson told Toney she had left her patients uncared for and had left her shift without telling anyone she would not be returning, Toney replied she could not leave the court and abruptly hung up.  It was determined that Toney did not return until after 8:00 p.m., after her shift had ended.

Watson explains that upon further investigation, which included an interview with Toney, she learned that Toney had known before her shift started that she was required to attend court

that afternoon, and yet she chose to leave without telling anyone where she was going or how long she would be gone or, more particularly, that she might be absent for the rest of her shift. As a result, the Hospital was left to scramble to assure critical nursing care for Toney's five seriously ill patients when it realized she had not returned as stated.  Watson related the facts, as she understood them, to Melinda Streif, Regional Director of Human Resources, and the two determined that Toney's actions amounted to abandonment of her patients and warranted her termination.

Toney insists that Simmons' report that she left without reporting on her patients and without providing for their care was false and that consequently, the decision to terminate her was based on incorrect information.  However, she has presented no evidence to show that Select Hospital's contrary belief,  even if incorrect, was not honestly held.  Indeed, in her response, Toney acknowledges that Anderson relied on what she was told by Simmons; that Watson, in turn, had no reason to dispute that the information provided to her by Simmons and Anderson was accurate; and that Streif similarly had no reason to believe that Watson did not, in fact, have reason to terminate her.  It follows that plaintiff cannot carry her burden to show pretext and therefore, Select Hospital is entitled to summary judgment on Toney's Title VII claim for discriminatory discharge.

Additional Discrimination Claims

In addition to her claims for discriminatory discharge, Toney has alleged that she was subjected to discrimination in the terms and conditions of her employment as she was (1) subjected to disparate treatment in that white nurses received more favorable schedule and work assignments; (2) "passed over for promotions by those with less seniority and less qualifications than Plaintiff even though Plaintiff was fully qualified"; and (3) subjected to a hostile work environment.  In its motion, defendant has addressed and provided ample evidence and argument supporting summary judgment on each of these claims.  In her response, Toney has offered no argument or evidence in opposition.  Therefore, for the reasons assigned by Select Hospital in its motion, these claims will be dismissed.

Breach of Contract

Toney alleges a breach of contract claim under state law which is premised, it seems, on her allegation that she was discharged because of her race.  Her claim fails as a matter of law.

Mississippi adheres to the employment-at-will doctrine, which holds that in the absence of an employment contract or when an employment contract is for an indefinite term, the employment relationship may be terminated at any point by either party. Bobbitt v. Orchard, Ltd., 603 So. 2d 356, 360-61 (Miss. 1992).

24

Under the at-will employment doctrine, the employer or the employee may terminate the employment relationship for "a good reason, a wrong reason, or no reason." Id. (citation omitted). It is undisputed that Toney did not have a written employment contract and her employment was thus at-will.

Under Mississippi Law, the employment-at-will doctrine is only limited by the following: (i) where there is a contract of employment providing for a specific duration and termination without just cause occurs before expiration of that duration, see Rosen v. Gulf Shores, Inc., 610 So. 2d 366 (Miss. 1992); (ii) where termination is retaliatory, because the employee reports or refuses to participate in an unlawful act, see McArn v. Allied Bruce-Terminix Co., 626 So. 2d 603 (Miss. 1993); and (iii) where a handbook does not sufficiently preserve the at-will nature of employment and the employer "completely ignores" specific progressive disciplinary penalties for rule infractions, thus giving rise to contractual obligations, see Bobbitt, 603 So. 2d 356. See Byest v. Wal-Mart Stores, Inc., No. 4:13-CV-0009-DMB-JMV, 2014 WL 3891295, at *7 (N.D. Miss. Aug. 7, 2014) (recognizing three exceptions to at-will doctrine). Plaintiff apparently contends that her claim fits within the Bobbitt exception, not because of any procedural rules or progressive discipline that Select Hospital failed to follow but rather based on the provision

in Select Hospital's employee handbook that prohibits
discrimination in employment.

In <u>Bobbitt</u>, the Mississippi Supreme Court held that when
employers distribute handbooks or policy manuals, they may create
contractual obligations that override the at-will nature of an
employment relationship.  603 so. 2d at 361.  The <u>Bobbitt</u> court
concluded that language in policy manuals or handbooks may create
an obligation on the part of the employer to "follow its
provisions in reprimanding, suspending or discharging an employee
for infractions specifically covered therein." <u>Id.</u>  The court
made clear, however, that this obligation is nullified when there
is an express disclaimer in the manual explaining that its terms
do not affect the employer's right to terminate the employee at
will.  <u>See id.</u> at 362.

Even if Toney had presented evidence of discrimination –
which she has not – Select Hospital's anti-discrimination policy
cannot create a contract under <u>Bobbitt</u>, as its employee handbook
clearly states:  "Employment at Select Medical is at will.  This
means that either the employee or Select Medical has the right to
terminate employment at any time, and for any reason, with or
without cause and with or without notice." <u>See Crawford v. Bannum</u>
<u>Place of Tupelo</u>, 556 Fed. App'x 279, 284 (5th Cir. 2014)(anti-
retaliation provisions in employer's handbook and Statement of
Work did not negate clear and unambiguous pronouncement in

26

employer's handbook that employee Crawford was an at-will
employee).   Accordingly, Toney's breach of contract claim will be
dismissed.

Intentional Infliction of Emotional Distress

Select Hospital has moved for summary judgment on Toney's
claim for intentional infliction of emotional distress on the dual
bases that (1) she has failed to identify, much less present proof
of conduct rising to the level of extreme and outrageous conduct
required for a cognizable claim, see Raiola v. Chevron U.S.A.,
Inc., 872 So. 2d 79, 85 (Miss. Ct. App. 2004) (noting that "[o]nly
in the most unusual cases does the conduct move out of the realm
of an ordinary employment dispute into the classification of
extreme and outrageous, as required for the tort of intentional
infliction of emotional distress"); Peques v. Emerson Elec. Co.,
913 F. Supp. 976, 982 (N.D. Miss. 1996) (holding that claims in an
employment setting are viable only when the employer's conduct is
"so outrageous in character, and so extreme in degree, as to go
beyond all possible bounds of decency, and to be regarded as
atrocious, and utterly intolerable in a civilized community"); and
(2) she has not presented proof that she suffered the kind of
severe emotional distress needed to support such a claim, see
Rainer v. Wal-Mart Assocs., Inc., 119 So. 3d 398, 404 (Miss. Ct.
App. 2013) (stating that claim requires proof that plaintiff
"suffered severe emotional distress as a direct result of the

[acts] of the defendant"). Defendant's motion on this claim has facial merit, and Toney has not responded in opposition. Therefore, this claim will be dismissed.

Conclusion

Based on the foregoing, it is ordered that Select Hospital's motion for summary judgment is granted.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 26th day of October, 2015.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE

28